## Case No. 10,408.

### OCEAN INS. CO. v. SUN MUT. INS. CO.

[15 Blatchf. 249.] [1]

Circuit Court, S. D. New York. Sept. 13, 1878. [2]

MARINE INSURANCE — POLICY APPLICABLE TO EITHER OF TWO CHARTERS—REINSURANCE—PROOF OF LOSS—JUDGMENT AGAINST INSURED COMPANY—DELAY—COSTS AND EXPENSES.

1. A policy of reinsurance on a marine risk, issued by one insurance company to another, insured "$6,550 on charter, $2,650 on primage, and $1,500 on property, on board ship C. S. Pennell, at and from New York to San Francisco." There were two charters at risk during the voyage. The language of the policy was equally applicable to both, and it was *held* that the insured had proved that the insurance related to a particular one of the two charters.

2. In this suit on the reinsurance policy, proof of a judgment against the insured company on the policy issued by it, was, under the circumstances, *held* to be sufficient proof of loss, and of the insurable interest of the insured company.

3. The defence of delay on the part of the insured company in bringing suit, overruled.

4. The insured company was allowed to recover the amount it had paid on the judgment against it, and the costs and expenses it had paid in the suit which resulted in the judgment.

[Appeal from the district court of the United States for the Southern district of New York.]

This was an appeal by the libellant, in a suit in personam in admiralty, from a decree of the district court [Case No. 10,407], dismissing the libel. The following facts were found by this court: At the several times hereinafter mentioned, the libellant and the defendant were insurance companies, engaged in the business of insuring against losses by perils of the sea. The libellant, to be referred to herein as the Ocean Company, was incorporated under the laws of the state of Maine, and had its principal place of business at Portland in that state. The defendant, to be referred to as the Sun Company, was incorporated under the laws of the state of New York and had its principal

---

1 [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]

2 [Reversing Case No. 10,407. Decree of circuit court reversed by supreme court in 107 U. S. 485, 1 Sup. Ct. 582.]

place of business in the city of New York. On or about January 19th, 1864, the Sun Company issued its open policy, No. 51,564, to the Ocean Company, in the usual form, for the insurance of cargoes at and from Cuba to Boston or Portland, it being, however, expressly understood and agreed that no risk would be taken under it, unless the Ocean Company take or have an amount on same risk equal to one-half the amount covered by the Sun Company. On the 9th of February, 1864, it was agreed in writing, noted upon the policy, that the policy should cover such other risks as this (the Sun) company may approve and endorse thereon. Under this new arrangement, the clause limiting the risks to such as the Ocean Company retained an interest in to the extent named, to wit, an amount equal to one-half that of the Sun, was kept in force, but, February 24th, 1864, the president of the Sun Company wrote the Ocean Company as follows: "We are willing that you be not obliged to retain a half of risk, when you do not wish to do so, but we reserve the right to object to amounts returned, which it is not probable will be too great very often." A copy of the policy issued, with the endorsement thereon, is printed in the apostles in this case, as exhibit No. 1. This policy was issued with the expectation that it would be used by the Ocean Company for the purposes of reinsurance, an arrangement for such a business on the part of the Sun Company having been made. December 24th, 1863, Charles S. Pennell, as an owner and agent of the ship C. S. Pennell, of 975 tons burthen, and then lying in the harbor of Portland, Maine, chartered the whole of the vessel, "including the state rooms in cabin, not used by the officers, and deck rooms, not used for the crew or for sails and stores," to Sutton & Co., for a voyage from New York to San Francisco. No cargo was to be received on board, except with the written consent of the charterers; and they were to pay "for the charter or freight," on the good and proper discharge of the cargo in San Francisco, $26,500, less two and one-half per cent. commission. George M. Melcher was, at the time, master of the ship, and his primage on the freight money, if earned, would have been $1,325. This charter will be referred to as the San Francisco charter. After the making of this charter, the vessel sailed from Portland to New York, and was there put up and advertised, by Sutton & Co., as a general ship for San Francisco. That firm, at that time, represented what was known as the "Dispatch line of San Francisco packets." January 30th, while the ship was in New York, loading under her San Francisco charter, and advertised for that voyage, her master chartered her again to the Peruvian government. By the terms of this charter she was to sail from New York, "on or before June 1st, 1864, to San Francisco, and thence

proceed, with all convenient dispatch, to Callao, Peru," and from thence, if, on inspection, she should be found to be well conditioned for the voyage, to the Chincha Islands, for a cargo of guano, to be taken to Hamburg or Rotterdam. The freight to be paid was at the rate of £4 per ton of 20 cwt., British net weight, of guano, subject, however, to a deduction of five shillings per ton, if the vessel was not ready in Callao to proceed to the Chinchas by December 15th. This charter will be referred to as the "Rotterdam charter." On the 25th of February, 1864, while the ship was in New York loading, Charles S. Pennell, a part owner, took from the Ocean Company a policy, insuring his interest in the ship for $8,000, against war risks, and his interest in the Rotterdam charter for $8,000, against marine risks, on the voyage between New York and the Chinchas. In this policy, the duration and locality of the risk was described as "at and from New York, to, at and from San Francisco, Callao and the Chinchas." George M. Melcher was, at the time, owner of one-eighth of the ship, and master. On the 20th of March, he wrote one Sawyer, his agent at Portland, advising that the ship was about ready to sail, and directing that insurance be effected on his interest, as follows: "War risk to San Francisco, ship, $5,000; charter to San Francisco, $26,500, ⅛, $3,300; primage on same, $1,325; homeward charter from Chinchas, insure out, say, 1,750 tons, at £4, £7,000, at currency rate of exchange, $52,400, my ⅛, $6,550; primage on same, $2,650; chronometers, Dent, 1883, Negos, 1261, $500; and on our effects, clothing, &c., $1,000; making, total, $19,425." In the same letter it was said: "I think you had better put 5 or $6,000 more marine risk, in case I should lose the ship." Upon receipt of this letter, Sawyer applied to the Ocean Company for a policy upon the Rotterdam charter, primage and personal effects, to San Francisco. In doing so he exhibited his letter of instructions and explained fully all the circumstances. The risk was accepted, and a policy issued, March 23d, in which the risk was described, as follows: "$6,550 on charter, $2,650 on primage, and also $1,500 on property on board ship Chas. S. Pennell, at and from New York to San Francisco." On the same day, the Ocean Company insured the master for $3,000, on his interest in the ship, during the whole of her voyage, describing the duration and locality of the risk as, "at and from New York, to, at and from San Francisco and Chinchas, with usual liberties at Callao, to her port of advice and discharge in Europe." On the same 23d of March the president of the Ocean Company wrote the vice-president of the Sun, as follows: "* * * I also enclose returns for registry, as follows: * * * $5,000 on ship C. S. Pennell, to San Francisco and Chinchas, war; $5,000 on fr. of do., marine. * * * P. S. I also enclose an additional return for

insurance on charter, primage and property, per ship C. S. Pennell, to San Francisco only." The returns enclosed in this letter were as follows: "To the Sun Mutual Insurance Company: Enter on open policy of this company, No. 51,564, $5,000 on charter of ship Chas. S. Pennell, at and from New York, to, at and from San Francisco and Callao to Chinchas. Rate, three per cent. on board. New York, March 23d, 1864. J. W., V.-P. Ocean Ins. Co., Per G. A. W., Sec'y." "To the Sun Mutual Insurance Company: Enter on open policy of this company, No. 51,564, war risk only, $5,000 on ship Chas. S. Pennell, at and from New York, to, at and from San Francisco and Callao to Chinchas. Rate, three per cent. on board. New York, March 23d, 1864. J. W., V.-P. Ocean Ins. Co., Per G. A. W., Sec'y." "To the Sun Mutual Insurance Company: Enter on open policy of this company, No. 51,564, $6,550 on charter, $2,650 on primage, and $1,500 on property on board ship Chas. S. Pennell, at and from New York to San Francisco, including war risk. Rate, six per cent. on board. New York, March 23d, 1864. J. W., V.-P. Ocean Ins. Co., Per G. A. W., Sec'y." The first and second of these returns were for reinsurance on the risks taken for Charles S. Pennell, and the last on account of the risk taken in favor of the master on the Rotterdam charter and personal property on board, from New York to San Francisco. The risk on the vessel taken in favor of the master at the same time, was not reported to the Ocean Company. Upon the receipt of this letter, with its inclosures, the vice-president of the Sun Company wrote the Ocean Company, under date of May 24th, as follows: "Your favor of the 23d inst. is received, * * * and returns as stated. Those * * * on charter, &c., per Chas. S. Pennell, $10,700 in conformity thereto. For the marine risk per Chas. S. Pennell to San Francisco, thence to Callao and Chinchas, our regular tariff rate is four and one-half per cent.; the war risk on same is worth the same, but we propose to enter for both marine and war, on $5,000, for four per cent." To this the president of the Ocean Company replied, under date of March 26th, as follows: "Your favor of the 24th inst. is received. I think, really, considering that you have the risk on charter, primage and property to San Francisco at full rates, you should take the war and marine to San Francisco and Chinchas on C. S. Pennell, at 6 per cent., as there is or will be but little risk in the Pacific, after leaving San Francisco. I can have both risks taken at less than these rates * * *." In response to this, the vice-president of the Sun wrote, under date of March 27th, as follows: "Your favor of the 26th inst. is received with a return * * * which is entered in conformity thereto, as have also been the returns of the 23d inst. per ship C. S. Pennell." The endorsement of these returns upon the open policy, was as follows:

| 1864. | Vessel. | From. | To. | Am'ts. | Rates. | Prems. |
|---|---|---|---|---|---|---|
| March 23, | Ship "Charles S. Pennell," | New York. | S. Francisco, Callao and Chinchas, on charter, $5,000 $ | | $150 | marine. |
| | | | " vessel, 5,000 $ | | 160 | war only. |
| | | | " charter, 6,550 $ | | 393 | war and marine. |
| | | | " primage, 2,650 $ | | 159 | : |
| | | | San Francisco, " property, 1,600 $ | | 90 | : |

At the time these returns were made and accepted, the Sun Company had actual knowledge of the San Francisco charter, and had taken risks on cargo shipped on board the vessel to San Francisco under it. When the returns were made by the Ocean Company to the Sun, for acceptance and endorsement, no special mention was made of the Rotterdam charter, and no information was given the Sun Company of what had transpired between the Ocean Company and the agent of the master, when the insurance was effected. No allusion was made to the letter of the master to his agent, which was shown the president of the Ocean in connection with the application to that company, and the Sun Company had no other knowledge of the existence of the Rotterdam charter, than such as is to be inferred from the correspondence which preceded the acceptance of the risk. Both the president of the Ocean Company and the vice-president of the Sun Company are dead. The first named, died in July. 1869, and the last, some time before January 1st, 1867. The ship sailed from New York to San Francisco about the 1st of April, 1864, having on board a full cargo under her San Francisco charter. Having met with a disaster on the voyage, she put into Rio Janeiro, where she was condemned and sold and the voyage broken up. The loss under the risk taken in favor of Charles S. Pennell, both on the ship and the Rotterdam charter, were paid by the Sun Company without objection, October 23d, 1865, and May 5th, 1866. In due time after the loss occurred, the master filed with the Ocean Company his proofs under his policy on account of the Rotterdam

charter and his primage thereon. These proofs were promptly forwarded by the Ocean Company to the Sun, and no objections to their form were ever made. Payment was refused by the Sun Company, on the ground that the master was over-insured, and also upon the ground that the ship had been fraudulently cast away, and the Ocean Company was advised not to pay the claim, on that account. Pursuant to this advice, payment was refused by the Ocean Company, and, in October, 1866, Melcher, the master, commenced suit upon his policy in the courts of Maine. Of the commencement of this suit notice was immediately given the Sun Company by the Ocean Company, and the Sun Company interested itself in the preparation for defence. An agent of those interested, including another company having a risk upon the voyage, was sent to Rio Janeiro to ascertain the facts in relation to the loss, and report. In the meantime, the suit upon the policy was suffered to remain in court without being pressed. At the October term, 1869, the counsel for the plaintiff insisting that something should be done, it was agreed, on behalf of the Ocean Company, that the case should, if possible, be tried at the January term, 1870. In November, or late in October, 1869, the counsel on the part of the Ocean Company visited New York for the purpose of having a personal interview, in respect to the case, with the officers of the Sun Company. He there met the then vice-president of the company. At the interview which then took place, the points of defence that had been previously suggested by the companies having been discussed, the counsel stated, that, in his opinion, they could not be sustained by the evidence, but that he intended to make the point that the Rotterdam charter was not included in the risk as described in the policy. He said, however, that he had been informed by the attorneys who conducted the case for the plaintiff, that they had extrinsic evidence which would establish the liability, and which they expected to introduce. This extrinsic evidence he considered inadmissible, but he, at the same time, said, that, if admitted, the defence to the action would undoubtedly fail. He then informed the Sun Company, that, upon the presentation of the evidence on the trial, he should object to its admission and he had no doubt the presiding judge, under the practice in that state, would take advice of the supreme court upon that question, before proceeding further. If the evidence was ruled out, he expected to succeed in his defence, but, if admitted, he had little hopes. He did not at that time know precisely what the testimony would be, and he did not communicate to the company the particular facts relied upon. At the conclusion of the interview, he was instructed by the vice-president of the Sun Company to go forward with the defence and make every point possible. He

was paid, at the time, one hundred dollars, for which he gave a receipt as follows: "New York, Nov. 2d, 1869. Received from the Sun Mutual Insurance Company one hundred dollars, on account of legal expenses and services for defending the Ocean Insurance Company, of Portland, from claim for loss on charter and primage in case of the ship C. S. Pennell, reinsured by the Sun Mutual Insurance Company for the Ocean Insurance Company. John Rand." At the April term, 1870, the cause came on for trial and the questions were raised[1] upon the admissibility of the extrinsic evidence, and reported to the supreme court for its opinion. The testimony objected to included the deposition of Sawyer, the agent of the insured, as to what transpired between him and the Ocean Company at the time the insurance was effected; the letter from the insured to Sawyer specifying the risk to be taken, and which was submitted to the company by the agent, as showing the authority under which he acted; and, also, the Rotterdam charter. On the 6th of October, 1870, the attorneys of the Ocean Company sent the Sun Company a copy of the case thus made, which contained a statement of the evidence offered and objected to. In the letter transmitting this document, the attorneys said: "The question now presented to our court is simply, whether he (the insured) shall be allowed to put in the testimony. If not allowed, there is an end of the case. If allowed, then we go to trial upon other points of defence." In reply to this, the president of the Sun Company wrote as follows: "New York, Oct. 15, 1870. Messrs. J. & E. M. Rand, Portland, Me. Gents: Yours of 6th inst. was duly received, also the printed documents which you sent, and which we have perused carefully. It is shown by the testimony that the policy was made in accordance with the application of the plaintiff, and that there was no misunderstanding in relation thereto, calling for the admission of evidence outside of the policy, to explain it. Certainly, none would be admissible to contradict it, for that would be setting up a new contract other than the policy itself which is sued upon. It is important, therefore, to have excluded all evidence tending to contradict the policy. By the policy as made, the plaintiff insured on charter, New York to San Francisco. $6,550; on primage, $———; on personal effects, $———. There is no such charter shown, but the plaintiff sets up a charter to San Francisco and ports beyond, as described in the charter party. The insurance of the charter to San Francisco was an insurance of only a part of said charter—not amounting even to a part insurance of the charter—because, as the charter party is to the effect that no money is to be paid by the charterers unless the whole round voyage is performed, and the contract being indivisible, if no money was to be paid for the passage to San Francisco, the plain-

tiff had no insurable interest in that part of the charter. Besides, the ship was loaded to her full capacity and was carrying full freight on said passage outside of the charters, which was covered under special policies. The plaintiff has, therefore, by the perils insured against in the policy, suffered no loss beyond what he has already been indemnified for under his policy on freight. The interest of the plaintiff in the passage to San Francisco was, therefore, an impossible interest. I do not mean to say that he had no interest in the charter party, but the risk under our policy, being only to San Francisco, ended before the charter party could by any possibility be performed. I think, therefore, that the main question is the question of interest, and think that the above reasons will be found sound in law. Please let me hear from you as to your opinion of them, and also as to your line of defence—what your points are—in order that I may be able to form some opinion as to the ultimate issue of the suit. Yours, respectfully, J. P. Paulison, President." In or about January, 1872, the supreme court decided that the testimony was admissible, and, on the 16th of that month, the attorneys advised the Sun Company of the result, and sent a copy of the opinion delivered. They also said that the case would probably come up again for hearing in a week or two, and asked that papers of any kind, relating to the defence, in the possession of the Sun Company, might be forwarded to them at once. Upon the receipt of this last letter, the case was submitted by the Sun Company to its counsel in New York, who gave his opinion, in writing, to the effect, "that the Sun Mutual Insurance Company's liability under the reinsurance policy cannot be extended beyond the obvious import of the terms in which it is expressed. The letter of Melcher, ordering the insurance not having been exhibited to them, nor the explanations of Sawyer made to them, they cannot be affected by them; and, hence, if the admission of extrinsic evidence, as to what took place between Sawyer and the Ocean Company, when the original insurance was made, varies the case, as between that company and Melcher, from what it appears to be on the face of the original policy, I cannot see that it is a matter which concerns the Sun Company." January 29th, a copy of this opinion was forwarded by the Sun Company to the attorneys in Portland, and attention called to its contents. At the January term, 1872, the cause was again tried, and, the testimony being all in, the case was withdrawn from the jury and submitted to the court, to enter such judgment as law and the evidence required. The point was directly made, by the Ocean Company, that the policy never actually attached, because the ship never actually or legally sailed under the Rotterdam charter. On the 12th of July, 1872, the case having been printed, a copy was sent by the attorneys in Portland to the Sun Company, with a statement that the cause would come on for argument before the full bench in a few days. Permission was also asked to draw on the company, at sight, for five hundred dollars, on account of fees and disbursements. On the 15th of July, the Sun Company replied, denying its liability to pay fees, and saying that, "as the suit is against the Ocean Company and not against us, you must look to them for your fees." It is also said, in the letter, that, when the payment of $100 was made, in November, 1869, the case, as subsequently developed, was not fully understood. A judgment was afterwards rendered in the suit against the Ocean Company, for $9,200 and interest from April 27th, 1865. This judgment was satisfied by payments of the Ocean Company, as follows: July 19th, 1873, $4,234 39; July 21st, 1873, $10,086 55. The costs in the action, which were included in this payment. were $574. The account of the counsel in the cause for their professional services and disbursements, over and above the $100 paid by the Sun Company, was $1,164 70. This was also paid by the Ocean Company, July 23d, 1873, and was reasonable. Payment of the amount of the judgment and the account for counsel fees was duly demanded of the Sun Company by the Ocean Company before the commencement of this suit and refused.

Enos N. Taft and Robert D. Benedict, for libellants.

Joseph H. Choate and Charles H. Tweed, for respondents.

WAITE, Circuit Justice. The important question, which presents itself at the outset of this case, is, whether the Sun Company's policy covers the Rotterdam charter. The language is, "$6,550 on charter, $2,650 on primage, and $1,500 on property on board ship C. S. Pennell, at and from New York to San Francisco." This is to be construed in the light of the circumstances which surrounded the parties when the contract was made. These were: 1. That the Ocean Company did insure that charter and did not insure any other; 2. That the only interest which that company had in that charter was as insurer; 3. That it had no insurable interest whatever in the San Francisco charter; 4. That the Sun Company, when it took the risk, had full knowledge of the San Francisco charter, and of its general provisions; 5. That the arrangement between the two companies contemplated principally, if not altogether, the reinsurance, by the Sun Company, of risks taken by the Ocean; 6. When the risk was taken by the Sun Company, both parties supposed it covered that taken by the Ocean; 7. There was no actual fraud on the part of the Ocean Company, and there was no intentional concealment or misrepresentation.

. The Maine court decided, that the words, "at and from New York to San Francisco," were not used to describe the charter insured, but the locality and duration of the risk. In that I fully concur. The opinion of Judge Walton is entirely satisfactory to my mind, and I shall not attempt to add to what he has said. In fact, I do not understand it to be contended now, that if, in reality, the minds of the two companies met upon a contract for the insurance of the Rotterdam charter, it may not be proved. The real controversy is, as to whether or not that was the contract, and not as to the admissibility of extrinsic evidence to prove it.

It is quite true, that the burden of showing that the risk was taken upon the Rotterdam charter is upon the Ocean Company. There were two charters at risk during the voyage. The language of the policy is equally applicable to both, and it is, therefore, incumbent on the insured to prove to which it actually does relate. It is not contended that, when the risk was taken, the letter of Melcher to Sawyer, or the explanations of Sawyer to the Ocean Company, were communicated to the Sun. If there is not enough to charge the Sun Company without this, there can be no recovery.

Every contract is, if possible, under the settled rules of construction, to be so interpreted as to give it some effect. If this policy is confined to the San Francisco charter, it can have no effect, as the Ocean Company had no insurable interest in that charter. There was nothing illegal in the arrangement by which the ship became bound to fill the two charters, after leaving New York and before her return. Neither did one of the charters interfere with the other. That to San Francisco did not prevent the ship from going to Callao and the Chinchas, after discharging her cargo at San Francisco; and that to Rotterdam did not forbid the taking on cargo in New York to be delivered in San Francisco, while on the way to the Chinchas for the guano to be carried to Rotterdam. The Rotterdam charter was satisfied in this particular, if the ship left New York by June 1st, and was ready to sail from Callao for the Chinchas within a reasonable time after December 15th.

It is clear, from the evidence, that, when the risk was taken by the Sun, it knew of the two charters. Knowledge of that to San Francisco is conceded. In fact, this knowledge is made one of the elements of the defence in this action. To my mind, also, knowledge of that to Rotterdam, or, what is equivalent, of some charter to be in existence after the ship left San Francisco, and before she returned from the voyage on which she was about to sail, is equally well established. The same letter from the Ocean Company, which tendered this risk, tendered another upon a charter expected to be in jeopardy after the ship left San Francisco.

Otherwise, a premium for insurance "at and from New York, to, at and from San Francisco and Callao to Chinchas," would not have been paid. This could not have been the San Francisco charter, for all freight under that would have been earned upon the delivery of the cargo at San Francisco. The risk thus tendered was accepted, and the loss, when it occurred, paid. When the proofs of loss were presented, and the payments made, both the president of the Ocean Company, who tendered the risk, and the vice-president of the Sun, who accepted it, were living, and no doubt seems to have been entertained by them that the policy under which the claim was made covered the Rotterdam charter. When the Ocean Company tendered the Sun the risk which is now under consideration, it must have had in mind the Rotterdam charter only, because it had no interest whatever in that to San Francisco. It was seeking indemnity against the liability it had incurred, and that was on account of the Rotterdam charter alone. There cannot be reinsurance, if there is not insurance to be insured against.

It remains only to consider, whether the Sun Company did, in fact, accept the risk, supposing, and having the right to suppose, it related to the San Francisco charter, and not to the Rotterdam. The application was for reinsurance upon a charter—that is to say, freight to be earned under a charter—to be fulfilled during the voyage upon which the ship was to enter when she sailed from New York. As there were two charters, both known to the Sun, that company ought to have understood that the application related to the charter which had already been issued by the Ocean. A policy issued under such circumstances will be presumed to refer to that charter, unless a contrary intention is clearly manifested. Certainly, no intention to exclude the Rotterdam charter was manifested in this case. The correspondence, which contains all the evidence there is upon the subject previous to the acceptance of the risks, makes no mention, directly or indirectly, of any other charter. Each of the other applications which accompanied this, indicates, in the most unmistakable terms, that the voyage upon which the ship was to sail would not end at San Francisco, and that she contemplated other service than that required by her San Francisco charter. Under one of these applications, a risk upon the Rotterdam charter was confessedly taken, and, in the letter which preceded the acceptance of that risk, and upon which it was largely predicated, allusion is made to the present application in terms which indicate very strongly that both referred to the same charter, but to different interests. The language is: "I think really, considering you have the risk on the charter, primage and property to San Francisco, at full rates, you should take the war and marine to San

Francisco and Chinchas * * * at six per cent., as there is, or will be, but little risk in the Pacific, after leaving San Francisco." Equally significant was the form of the present application itself. It was added, by way of postscript, to the letter which transmitted the other, and which, as has just been said, embraced the Rotterdam charter. The words are: "I also enclose an additional return for insurance on charter, primage and property to San Francisco only." There cannot be a doubt, if another charter was intended, it would have been so said.

Another important consideration is, that the charter to be insured was one upon which the primage was to be $2,650. No San Francisco charter alone could have been expected to furnish such an amount of primage, and, taken in connection with the Chinchas, as it must be, as a point in the voyage, a guano contract of some kind is clearly indicated.

This much for the evidence of what occurred before the risk was taken. That which happened afterwards is no less significant. When the loss occurred, and the first proofs were made, the officers of the two companies, active in taking the risks, were alive. No intimation was then given by either that the risk did not cover the loss that was claimed. The only ground of defence put forth by the Sun Company was, that there had been over-insurance and fraud. To establish this, an agent was sent to Rio Janeiro for testimony. Certainly, if it had not then been supposed, by these officers, that the policy covered the loss, no such trouble would have been taken, and no such expense incurred. It is to be borne in mind, also, that this suggestion of defence came from the Sun Company, and no other seems to have been thought of until after both the president of the Ocean and the vice-president of the Sun were dead, and it was apparent that the evidence was not sufficient to relieve the companies from their responsibility on that ground. Then, for the first time, the counsel suggested that the policies did not cover the Rotterdam charter, and that point was put forward "to defeat the swindling claim." It was not until long after this, when, by the extrinsic evidence, the parties were driven to their original defences, that the Sun Company claimed to occupy a different position, in respect to the case, from the Ocean. The risk was taken March 23d, 1864. The loss occurred in June following. The parties commenced their correspondence within a proper time thereafter. The loss to Pennell, the owner, was paid in 1865 and 1866. The suit was commenced against the Ocean in September or October, 1866. No other defence than over-insurance and fraudulent loss was suggested by any one until November, 1869, and then by the counsel in the cause, and not the parties. In October, 1870, the Sun Company was fully advised in respect to the extrinsic evidence upon which it was expected the Ocean would be held, and it was not until this evidence was admitted, more than a year afterwards, that it was even hinted by the Sun Company that this altered its own position. Under all these circumstances, I cannot come to any other conclusion than that the policy of the Sun Company covers the Rotterdam charter.

It is, however, further contended, that, even if the policy does cover the risk, it is void, because the Ocean Company, when it applied for the insurance, concealed from the Sun the fact that no freight was to be carried under the charter, until after the arrival of the ship at San Francisco. Such I do not understand to be the fact. As has already been seen, it was disclosed in the application, that insurance was wanted upon a charter to be operative and in force after the ship left San Francisco. The Sun Company knew that no freight, under such a charter, could be carried between New York and San Francisco, because the San Francisco charter, as to which it was fully advised, contemplated a full cargo between New York and San Francisco, and ended upon the discharge at the last named port. The particulars of the Rotterdam charter beyond San Francisco were unimportant, as the risk was to end there. It is not pretended now that the charter was not made, or that it was valued, for the purposes of the insurance, at more than it was worth. No such defence has been put upon the record here, or upon that of the suit in Maine. This objection, therefore, cannot be maintained.

It is next insisted, that sufficient proof of the loss has not been made. As has already been seen, the Sun Company was a reinsurer of the Ocean. In effect, the Sun Company guaranteed the Ocean against loss by reason of the risk it had taken upon the charter. When the claim for the loss was made upon the Ocean, it was at once referred to the Sun, and that company advised its disallowance. When, in consequence of the refusal of the Ocean Company to pay, suit was commenced, the Sun was promptly notified. The Sun at once took part in the defence, consulted with the counsel, and advised as to points to be taken. A judgment, under such circumstances, finding the loss, concludes the Sun Company. Proof of the judgment, therefore, is equivalent to proof of loss.

Again, it is said, that there was an utter want of an insurable interest in the freight to be carried under the Rotterdam charter, before the arrival of the vessel at San Francisco, she being on the route from New York to that point, carrying full freight under the San Francisco charter, and the Rotterdam charterers having no interest or concern whatever in the performance of the voyage to San Francisco. This precise point was made in the Maine court. It was specially relied upon by the Sun Company, and, even

after the counsel had made the objection to the admissibility of the extrinsic evidence, and the president of the Sun Company had seen and "perused carefully" the case as made upon that point, he (the president) wrote the counsel, pressing this defence, and saying that he thought it the "main question." At the final hearing it was urged upon the attention of the court, and its discussion occupies the principal portion of the opinion of Chief Justice Appleton, in disposing of the case. The Sun Company is bound by that judgment, and the question is not now an open one.

The clause in the original policy, which required the Ocean Company to insure on the same risk an amount equal to one half of that covered by the Sun, was waived, before this insurance was effected, by the letter of the Sun Company, under date of February 24th, 1864, which has been put in evidence since this appeal was taken. The acceptance of the full risk after that date binds the Sun Company.

There is no statute of limitations applicable to courts of admiralty, in this class of cases. Stale claims will not be entertained in that court, any more than in equity; and, to determine what is stale, resort is sometimes had to the limitation in common law actions, established by statute; but the statutes themselves are not binding. The court is emphatically a commercial court, and requires reasonable promptness on the part of its suitors. Here, there has been no unnecessary delay. The Ocean Company has been active all the time, and has always proceeded under the supervision, and in accordance with the suggestions, of the Sun. This suit was commenced in a little more than sixty days after the liability of the Ocean Company was fixed in the very action which the Sun Company had promoted for that purpose, and which, until a short time before its termination, it had treated as substantially against itself. Under such circumstances, a court of admiralty cannot hold that the Ocean Company has lost its rights by delay.

The costs and expenses paid in the suit in Maine are not unreasonable, and they were all incurred under the advice of the Sun. They are, therefore, recoverable, in this action against the Sun, as the reinsurer.

Let a decree be prepared in favor of the Ocean Company, for the payments of July 19th, 1873, $4,234 39; July 21st, 1873, $10,-086 55; July 23d, 1873, $1,164 70; in all, $15,485 64, with interest from July 21st, 1873, at seven per cent. per annum.

[On appeal to the supreme court, the decree of this court was reversed, and the case remanded. with orders to enter a decree dismissing the libel. 107 U. S. 485, 1 Sup. Ct. 582.]